**Elouise Pepion COBELL, et al., Plaintiffs,**

v.

**Gale A. NORTON, Secretary of the Interior, et al., Defendants.**

**No. CIV.A.96–1285 (RCL).**

United States District Court, District of Columbia.

March 5, 2003.

### *MEMORANDUM AND ORDER*

LAMBERTH, District Judge.

This matter comes before the Court on Interior defendants' motion for a protective order regarding documents requested by the Special Master–Monitor ("Monitor") and regarding the rule announced by the Monitor concerning deposition questioning [1747], which was filed on January 23, 2003. Upon consideration of defendants' motion, plaintiffs' opposition thereto, defendants' reply brief, and the applicable law, the Court finds that defendants' motion should be denied.

## I. PROCEDURAL BACKGROUND

On April 16, 2001, with the consent of both parties, the Court appointed Joseph S. Kieffer, III, to serve as court monitor in this action. Mr. Kieffer was directed to "monitor and review all of the Interior defendants'

trust reform activities and file written reports of his findings," which were to include "a summary of the defendants' trust reform progress and any other matter [he] deems pertinent to trust reform." Order dated April 16, 2001 at 2. Defendants were ordered to "facilitate and assist Mr. Kieffer in the execution of his duties and responsibilities" and to provide him with "access to any Interior offices or employees to gather information necessary or proper to fulfill his duties." *Id.*

On September 17, 2002, the Court found Interior Secretary Gale Norton and Assistant Interior Secretary Neal McCaleb to be in civil contempt for committing several frauds upon the Court. In a memorandum opinion issued that date, the Court ordered a special master to be appointed in the instant case to monitor the status of trust reform. Explaining that there were "no practical means by which this Court alone can monitor the status of trust reform or the defendants' purportedly vast efforts to bring themselves into compliance with their trust responsibilities," the Court determined that the appointment of a special master was "clearly necessary to ensure that this Court and the plaintiffs receive timely, accurate information regarding the status of trust reform and the defendants' efforts to discharge properly their fiduciary duties." Mem. Op. dated Sept. 17, 2002, at 259, 258. In order to ensure that the parties would understand the nature of the duties bestowed upon the special master-monitor, the Court specified that "[t]he special master-monitor shall also oversee the discovery process and administer document production, except insofar as the issues raised by the parties relate to IT security, records preservation and retention, the Department of the Treasury, or Paragraph 19 documents" and that "[a]ll other future discovery matters shall be within the purview of the newly appointed special master-monitor unless the Court specifically directs that they be handled by Special Master Balaran." *Id.* at 261.

The Court entered an order the same date appointing Mr. Kieffer to serve as Special Master–Monitor in this case, pursuant to Rule 53 of the Federal Rules of Civil Procedure. The order declared that "[t]he Special Master–Monitor shall have and shall exercise the power to regulate all proceedings in every hearing before the master-monitor and to do all acts and take all measures necessary or proper for the efficient performance of the master-monitor's duties, as set forth in this order." Order dated Sept. 17, 2002, at 3. This language quoted directly the description of the powers granted to special masters appointed pursuant to Rule 53. Additionally, the appointment order provided that

> [t]he Special Master–Monitor shall also oversee the discovery process in this case and administer document production—except insofar as the issues raised by the parties relate to IT security, records preservation and retention, the Department of the Treasury, and Paragraph 19 documents—to ensure that discovery is conducted in the manner required by the Federal Rules of Civil Procedure and the orders of this Court. The Special Master–Monitor shall file with the Court, with copies to defendants' and plaintiffs' counsel, his report and recommendation as to any discovery dispute that arises which cannot be resolved by the parties.

*Id.* at 3–4.

On December 20, 2002, plaintiffs deposed Acting Special Trustee Donna Erwin. Towards the end of the deposition, plaintiffs asked Erwin whether Justice Department attorneys had made any factual misrepresentations to the Court during a hearing on December 17. Defense counsel directed Erwin not to answer the question, invoking attorney-client privilege and claiming that the question was harassing. The Monitor determined that the information sought by plaintiffs was not privileged, and that the question was not harassing in nature. Despite the Monitor's determination, defense counsel ordered Erwin not to answer the question. Because of the repeated objections of defense counsel, the deposition ended without Erwin providing an answer to the question.

On January 2, 2003, citing the incident that had occurred at the end of the Erwin deposition, the Monitor informed defendants:

> The result of defendants' counsel's refusal to accept the authority of the Special Mas-

ter–Monitor to regulate the depositions, in my opinion, has been to put plaintiffs' counsel at a severe disadvantage due to plaintiffs' counsel's acceptance of the direction of the Special Master–Monitor even in the presence of the defendants' counsel's active objection to and refusal to follow it. This conduct cannot continue without further erosion of the Court's authority and the resultant inability of plaintiffs to conduct effective Phase 1.5 trial discovery. Defs.' Mot. for a Protective Order as to Discovery by the Special Master–Monitor and as to the Rule Announced by the Special Master–Monitor Concerning Deposition Questioning ("Mot. for Protective Order"), Ex. T, at 3. Citing the above-mentioned language from the Court's September 17, 2002 order, the Monitor informed defendants that during future depositions, if defense counsel refused to comply with instructions issued by the Monitor pursuant to his authority under Rule 53 to regulate all proceedings in every hearing before him, the Monitor would consider terminating the deposition and filing a report and recommendation with the Court. *Id.* The Monitor explained that such a report could include a recommendation that the Court issue an order to defense counsel to show cause why his or her conduct should not be referred to the Disciplinary Panel of the U.S. District Court for the District of Columbia for review and appropriate action under Rule 8.4(d) of the District of Columbia Rules of Professional Conduct,[1] or why the conduct of defense counsel did not warrant sanctions under Rule 37(a)(4)(A) of the Federal Rules of Civil Procedure.[2] *Id.*

On December 18, 2002, during a deposition overseen by the Monitor, Office of Historical Accounting Director Bert Edwards noted that he had "seen a letter from [Special Trustee] Slonaker that says an historical accounting was not possible. I believe that was May 5, but I'm not sure." Transcript of Deposition of Bert Edwards, December 18, 2002, at 219. Edwards also stated that he had received a letter from Slonaker, in response to a memorandum from the Office of Historical Trust Accounting (OHTA), which stated that "the judgment accounts that we did constitute historical accounting." *Id.* On December 22, 2002, the Monitor wrote to defense counsel requesting copies of the letter and memorandum "and any other correspondence between Mr. Slonaker and his staff and Mr. Edwards and his staff regarding the judgment accounts and the OHTA's personnel's request for the Special Trustee's opinion or comments about the judgment accounts' qualification as an historical accounting." Mot. for Protective Order, Ex. D, at 2. The Monitor explained that he sought the documents pursuant to his authority under his appointment order "to monitor the status of trust reform and the Interior defendants' efforts as they relate to the duties declared by the Court and prescribed in the 1994 Act." *Id.*

On December 31, 2002, defense counsel responded to the Monitor's request by providing the Monitor with the letter and selected portions of the memorandum that he had requested. Asserting that two attachments of the memorandum "may be privileged," defense counsel stated that defendants would "provide a supplemental response upon further review of this material." Mot. for Protective Order, Ex. E, at 2. Defense counsel also stated that defendants would ascertain whether they possessed any of the other correspondence sought by the Monitor and would provide a further response. *Id.*

---

1. Rule 8.4(d) of the D.C. Rules of Professional Conduct provides that "[i]t is professional misconduct for a lawyer to engage in conduct that seriously interferes with the administration of justice."

2. Rule 37(a)(4)(A) of the Federal Rules of Civil Procedure rule provides, in relevant part, that if a motion to compel disclosure or discovery is granted,

> the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds that the motion was filed without the movant's first making a good faith effort to obtain the disclosure or discovery without court action, or that the opposing party's nondisclosure, response, or objection was substantially justified, or that other circumstances make an award of expenses unjust.

The next day, the Monitor issued another written request for the documents he had sought in his December 22 letter. The Monitor discussed the conclusions reached in the Court's December 23 ruling concerning the application of the attorney-client privilege to the instant litigation. Mot. for Protective Order, Ex. F, at 2–3. The Monitor then informed defendants that, based on Edwards's description of the documents in question during his deposition, there was no reason to believe that the documents were protected under attorney-client privilege. *Id.* at 2. Accordingly, the Monitor made a second request for the documents, asking that they be delivered to him by January 3. *Id.* at 3.

On January 3, defense counsel responded to the Monitor's second request. After summarizing the previous communications, defense counsel stated: "To the extent you have now assumed the authority to investigate the accuracy of Mr. Edwards's deposition testimony, or the adequacy of the judgment accountings, we believe your actions exceed those that have been (or could be) authorized by the Court." Mot. for Protective Order, Ex. G, at 2. Defense counsel concluded with the following declaration:

> We attempted to accommodate your December 22 request because it was not obviously inconsistent with your authority and it sought specific documents that were readily accessible. As your subsequent request suggests that you intend to undertake an inquiry that may be improper, and to which we therefore cannot consent, we request that you provide us (1) notice of the precise scope of the inquiry you intend to undertake; and (2) an explanation of exactly how this inquiry is authorized by the court order appointing you.

*Id.*

The Monitor made a third request for the documents in a letter dated January 6. Mot. for Protective Order, Ex. H. The following day, defense counsel responded that defendants required further time to evaluate the Monitor's requests, and reiterated a "concern

that your inquiry was no longer limited to your monitoring trust reform but now included an investigation into Mr. Edwards' credibility, which we maintain is beyond the scope of your powers as Special Master–Monitor." Mot. for Protective Order, Ex. I, at 1. The Monitor made a fourth request for the documents in a letter dated January 8, and explained that failure to produce the documents by the close of business that day would be construed as a refusal by defense counsel to produce the documents. Mot. for Protective Order, Ex. J, at 2. In a one-paragraph memorandum sent the same date, defense counsel informed the Monitor: "Whether we will produce or not produce those documents is still a matter under consideration and we will provide a supplemental response as soon as possible." Mot. for Protective Order, Ex. K.

On January 15, 2003, twenty-four days after the Monitor's original request, the Monitor issued a fifth written request for the documents. Two days later, defense counsel informed the Monitor that defendants would be "unable to comply with your request ... because [the documents] are protected by the attorney client privilege, the deliberative process privilege and the work product doctrine." Mot. for Protective Order, Ex. O. Defense counsel also claimed that

> [t]he Department of Justice has not yet made a final decision as to whether the Defendants will appeal from [the Court's December 23, 2002 opinion regarding attorney-client privilege]. Until that decision is made, we cannot disclose matters protected by the attorney client privilege because we must avoid taking action that would waive the privilege. Plaintiffs have recently sought a ruling by the Court on the applicability of the deliberative process and the matter is now awaiting the Court's ruling. Until it is finally resolved, we cannot waive the privilege by disclosing deliberative information.

*Id.*[3]

On January 23, defendants filed the instant motion, seeking a protective order against the Monitor. Plaintiffs filed their opposition

---

[3.] Defendants filed a notice of appeal of the Court's December 23, 2002 order on February 21, 2003. The Court issued a ruling on the

applicability of the deliberative process privilege on February 5, 2003.

brief on February 14, seeking an award of sanctions against defendants pursuant to Federal Rule of Civil Procedure 26(c).

## II. ANALYSIS

### A. Defendants' Motion for a Protective Order

■ Rule 26(c) of the Federal Rules of Civil Procedure provides that "[u]pon motion by a party or by the person from whom discovery is sought" and "for good cause shown," a district court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Defendants seek an order from this Court pursuant to Rule 26(c) that "(1) relieves them of any obligation to respond to discovery propounded by the Special Master–Monitor . . . and (2) proscribes the Special Master–Monitor from implementing a rule he has announced that would enable him from making dispositive substantive rulings at depositions and to compel witnesses, under threat of potential disciplinary action against their counsel, to answer questions over the objections and instruction of their counsel." Mem. in Support of Mot. for Protective Order at 1. The Court will examine each of these provisions in turn.

### 1. The Monitor's Document Requests

Before the Court may proceed to the merits of defendants' motion, it must first determine a threshold issue: whether Rule 26, which sets forth "general provisions governing discovery" applies to the actions of special masters appointed under Rule 53. De-

fendants have failed to direct this Court to any case, statute, or secondary authority that would support such a radical interpretation of the Federal Rules of Civil Procedure. Defendants' motion does include a footnote asserting that "[t]he protections afforded litigants under Federal Rule 26(c) (and Rule 45(c) in the case of subpoenas) apply to all types of discovery." Mem. in Support of Mot. for Protective Order at 12 n. 7. But this assertion sidesteps the question of whether document requests by a special master constitute "discovery" for the purpose of the Federal Rules.[4]

The power of a special master to request the production of documents from a party stems from Rule 53(c) of the Federal Rules of Civil Procedure, which provides that special masters "may require the production before the master of evidence upon all matters embraced in the [order of] reference, including the production of all books, papers, vouchers, documents, and writings applicable therein." There is nothing in any of the provisions of Rule 53 indicating that this power constitutes "discovery" that would be regulated by the provisions of Rule 26. Moreover, it would certainly be bizarre for the actions of a court-appointed judicial official to be governed by the provisions of the Federal Rules that regulate the actions of parties engaged in discovery. The sheer oddity of the situation only increases if, as in the instant case, the special master also functions as a discovery master, with the responsibility of overseeing the discovery process engaged in by the litigants.

---

**4.** Indeed, the secondary commentary and case law that defendants cite in support of this assertion have nothing to do with document requests made by special masters. The section of *Moore's Federal Practice* that serves as defendants' primary citation states, in its entirety: "Rule 26(c) applies to all types of discovery, including written discovery such as interrogatories, requests for production of documents, and requests for admissions. Rule 26(c) has even been applied in connection with a court-ordered medical examination." 6 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 26.101[2][a] (3d ed.1997) (footnote omitted). As for the two cases cited by defendants, both involve motions to quash subpoenas issued by special masters that had been authorized by the courts in question to conduct hear-

ings involving the parties. *See Halderman v. Pennhurst State Sch. & Hosp.*, 559 F.Supp. 153 (E.D.Pa.1982) (denying in part motion to quash subpoenas duces tecum issued under Rule 45 to compel attendance of state officials at a hearing to determine whether mentally retarded class members should be transferred from state-run hospital); *Pathe Labs., Inc. v. du Pont Film Mfg. Corp.*, 3 F.R.D. 11 (S.D.N.Y.1943) (denying motion to quash subpoena duces tecum issued under Rule 45 to produce records before a hearing master authorized to determine the issue of plaintiff's damages). The distinctions from the instant case barely warrant mentioning, but it will suffice to note that the Monitor is not a hearing master, and has not issued any subpoena to defendants, under Rule 45 or any other rule.

Instead of examining this threshold issue, defendants engage in a screed against the Monitor, culminating in the preposterous allegation that "[r]ather than adhere to the discovery oversight and trust reform monitoring roles for which he was appointed, the Special Master–Monitor has become an active *participant* in the discovery process, thereby making the Court tantamount to a litigant in this case." Mem. in Support of Mot. for Protective Order at 13 (emphasis in original).[5] To listen to defendants, one would think that the Court had done something revolutionary in appointing a special master with the power to request documents from a party. But Rule 53(c) clearly permits special masters to request documents that will assist them in the performance of their court-appointed duties, and the courts have certainly never considered such authority to be unusual or improper. *See, e.g., In re Kosmadakes*, 444 F.2d 999, 1004 (D.C.Cir. 1971) (approving a Rule 53 special master's decision to ignore expenditures of a fiduciary who had failed to comply with the special master's request for all relevant documents concerning the property in question within 15 days); *Ruiz v. Estelle*, 679 F.2d 1115, 1170 (5th Cir.1982), *amended in part and vacated in part*, 688 F.2d 266 (5th Cir.1982) ("The Special Master shall have unlimited access to the records, files and papers maintained by the Texas Department of Corrections to the extent that such access is related to the performance of the Special Master's duties of monitoring compliance. Such access shall include all Departmental, institutional, and inmate records, including but not limited to medical records. The Special Master may obtain copies of all such relevant records, files and papers."). Additionally, in the instant case, Special Master Balaran has repeatedly requested documents from defendants that would assist him in his duties as special master, without a word from either party that such requests were improper or exceeded the scope of his authority. There-

fore, the Court finds that the provisions of Rule 26(c) only possess meaning in a discovery context, and manifestly do not apply to document requests issued by a Rule 53 special master. Although this finding obviates the need for any further consideration of the present motion, the Court will nevertheless examine the claims alleged therein to determine whether any action by the Court is warranted in response to these claims.

■ In addition to challenging the authority of the Monitor to engage in activities clearly contemplated by the express language of Rule 53(c), defendants also claim that the ability of the Monitor to request documents has "created an inherent conflict with his Court-ordered authority to oversee and administer the discovery process." Mem. in Support of Mot. for Protective Order at 16. However, the only evidence that defendants present of this "inherent conflict" is the fact that, after defense counsel's first refusal to comply with his request for documents, the Monitor noted that, in his opinion, there was no reason to believe that the documents he had requested were protected under attorney-client privilege:

> OHTA's requests to either its legal trust advisory firm or its Legal Advisor are described by Mr. Edwards as requests to review *"the historical accounting* work" and *"the relevant legal authorities on appropriate reporting to trust beneficiaries."* These requests and the responses included in the memorandum's fourth and fifth attachments involve in whole the examination of the fiduciary duties of the Secretary—the Trustee delegate—to her IIM account holder trust beneficiaries. Because the requests were made to attorneys working for the Secretary and Mr. Edwards does not make the communications privileged[,] as the Court has now clearly held. Nor would the attorneys' responses to these requests if they, in part, discussed

---

5. Apparently not content with impugning the authority of the Monitor, defense counsel inserts a footnote tacitly accusing the Court of unethical behavior: "This development is even more troubling in light of the Court's statement, in its January 17, 2003 Memorandum and Order, that it meets regularly with the Special Master–Moni-

tor to, *inter alia*, instruct 'the Monitor which task he should perform next ....' " *Id.* at 13 n. 9. Given the recent conduct of defense counsel in this litigation, it is certainly ironic that defense counsel would presume to lecture the Court on the subject of legal ethics.

litigation-related matters involving the judgment accounts' "historical accounting." Mot. for Protective Order, Ex. F, at 2 (emphasis in original) (footnote omitted). Defendants imply that in making this statement, the Monitor was issuing a ruling on the propriety of her assertion of attorney-client privilege, and thus improperly intertwining his separate roles as discovery master and court monitor. But the Monitor never stated that he was ruling on the propriety of his own request, or making any finding of law as to the propriety of defendants' assertion of attorney-client privilege. Instead, the Monitor simply observed that Edwards's description of the documents clearly demonstrated that they were communications between a trustee and its attorneys concerning the administration of the trust, and pointing out that on December 23, the Court had ruled that such documents fell within the fiduciary exception to the attorney-client privilege.

Indeed, the propriety of the Monitor's request has nothing to do with the issue of whether the documents were privileged because, as explained above, the Monitor is a judicial official whose requests for documents do not constitute "discovery." Accordingly, the sole relevance of the privilege issue pertains to whether, after the Monitor had received the documents, it would be appropriate for him to disclose the contents of the documents, either in his reports or to plaintiffs. All that defendants were required to do to preserve her claim of privilege was to turn over the documents to the Monitor accompanied by a cover letter explaining that defendants were asserting attorney-client privilege over the documents. Then, before the Monitor could discuss their contents in his reports, or provide them to plaintiffs, it would be necessary for him to prepare a report and recommendation as to the application of the privilege, which would be ruled on by the Court after considering defendants' comments and objections to the report.

It is therefore apparent that it is defendants who are mistaken about the nature of the respective roles of the Monitor. In his capacity as discovery master, the Monitor makes determinations as to the propriety of discovery requests *by the parties,* including the applicability of asserted privileges. But when, acting in his capacity as court monitor, the Monitor requests one of the parties to produce documents related to any of the "matters embraced in the [order of] reference" *to him,* the Monitor is not making a discovery request. Therefore, neither the Monitor nor the Court need make any ruling at the time of the Monitor's request concerning any claim of privilege by the party from whom the documents are requested. In other words, when the Monitor issues a request for documents pursuant to his authority as court monitor, the Monitor is proceeding as an adjunct of the Court, and is therefore entitled to production of the documents requested, any claims of privilege notwithstanding. The issue of privilege only becomes relevant if the Monitor wishes to discuss the content of the documents in his reports to the Court, or provide them to plaintiffs. In such an instance, if the party from whom the Monitor received the documents has asserted any form of privilege, the Monitor may not discuss the contents of the documents in his reports, or provide them to plaintiffs, unless he first prepares a report and recommendation for the Court regarding the applicability of the privileges asserted, and the Court has determined that the documents are not privileged. Thus, it is the Court, not the Monitor, who makes all determinations regarding the assertions of privilege over documents requested by the Monitor in his capacity as court monitor, after considering the comments and objections of the parties to the Monitor's report and recommendation.

Therefore, it was improper for defense counsel to refuse to comply with a document request made by the Monitor on the grounds that the documents requested were protected under attorney-client privilege. The proper course of action would have been to comply with the Monitor's request, while simultaneously informing the Monitor that defendants were asserting attorney-client privilege with respect to the requested documents. Instead, defense counsel repeatedly refused to turn over documents requested by the Monitor pursuant to his order of reference, and challenged the authority of the Monitor to make such requests. Moreover, when the

Monitor informed defense counsel that he believed she was acting in bad faith, and that further refusals to comply with his requests could result in referrals to this Court for disciplinary action, defense counsel responded that

[s]uch threats and accusations are wrong, the plain intent being to chill the performance of defense counsel's ethical obligation to represent the United States zealously. The choice Mr. Kieffer seeks to force Government attorneys to make—abandon discovery objections they are ethically bound to assert on behalf of their clients, or face a recommendation for personal disciplinary action—is intolerable and has no place in our system of jurisprudence.

Mem. in Support of Mot. for Protective Order at 18.

In sum, there is no conflict between the Monitor's duty to monitor the status of trust reform—which includes the authority to request documents that will assist him in the preparation of his reports to the Court—and his authority to "oversee the discovery process in this case ... to ensure that discovery is conducted in the manner required by the Federal Rules of Civil Procedure and the orders of this Court." Defendants have pointed to no instances in which the Monitor's oversight authority over the discovery process has interfered in any way with his monitoring duties. Indeed, it would be surprising if any such conflict were to arise, given the fact that courts frequently assign a number of tasks to special masters in institutional reform cases like to the present case, including both monitoring duties and the authority to oversee discovery. *See, e.g., Gary W. v. State of Louisiana,* 601 F.2d 240, 245 (5th Cir.1979) (finding that the special master's duties to monitor implementation of court decree, and serve as fact finder and hearing officer accorded with the authority provided under Rule 53(c)); *Halderman v. Pennhurst State Sch. & Hosp.,* 612 F.2d 84, 111–12 (3d Cir.1979), *rev'd on other grounds,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) ("[T]he Commonwealth is simply incorrect in asserting that the scope of a master's duties is narrow. As one commentator

has properly noted, '(m)asters may be delegated the authority to issue subpoenas, hear grievances, take sworn testimony, and make formal or binding recommendations, including contempt findings, to the court.' In employment discrimination cases, for example, court-appointed administrators, who have the same powers as masters, have made frequent and successful use of rather wide-ranging powers. Authorized to take all action necessary to implement the decree and to remedy breaches of compliance, these administrators have performed negotiating and investigatory functions, and have issued recommendations for future implementation.") (internal citations omitted) *Nat'l Ass'n of Radiation Survivors v. Turnage,* 115 F.R.D. 543, 560–61 (N.D.Cal.1987) (appointing special master to monitor defendant's compliance with its court-approved plan for meeting discovery requests and to serve as discovery master).

Finally, defendants allege that "[i]t is unnecessary, and unduly burdensome to the Interior Defendants, for the Special Master–Monitor to be conducting pretrial discovery into areas that were or could be the subject of discovery by the Plaintiffs, particularly given the magnitude of the document discovery conducted by Plaintiffs to date." Mem. in Support of Mot. for Protective Order at 19. This contention is without merit. First, as explained above, the Monitor's document requests do not constitute "pretrial discovery." Second, the Court has scrutinized defense counsel's communications with the Monitor without finding any claim that the Monitor's requests are unduly burdensome. Instead, prior to filing defendants' motion for a protective order, the only complaint by defense counsel about the Monitor's requests was that they were allegedly improper. Third, defendants are free to request extensions of time from the Monitor to respond to his document requests, just as defendants are free to request similar extensions from the Court to respond to any of plaintiffs' discovery requests. *See* Order dated Feb. 6, 2003 (granting defendants' motion for an extension of time to respond to plaintiffs' discovery requests). Defendants have made no showing that the Monitor would refuse to consider an appropriate motion for an exten-

sion of time to respond to document requests that he has issued.

In sum, because the Monitor's document requests do not constitute "discovery," there is no basis for the issuance of a protective order relieving defendants of any obligation to respond to his requests, even if the Court were inclined to issue such an order. Additionally, defendants have failed to present any evidence indicating that the Monitor has failed to keep separate his duties as discovery master and court monitor, made unduly burdensome document requests from defendants, or become a "de facto litigant" in this case.[6] Accordingly, the Court will not issue an order that would render the Monitor completely unable to request documents that would assist him in his role as court monitor.

### 2. The Monitor's Rule Concerning Depositions

After seeking an order circumscribing the Monitor's ability to perform his duties as court monitor, defendants next petition the Court for a protective order limiting the Monitor's authority as discovery master.[7] As explained above, the Court has found that there is no basis for the issuance of a protective order under Rule 26(c) against a special master. Nevertheless, the Court will examine defendants' claims in order to determine whether any responsive action by the Court is warranted.

Defendants claim that the Monitor's "assertion of the authority to immediately resolve substantive discovery disputes as they arise during depositions is contrary to the express directive of the Court, set forth in the Appointment Order, requiring the Special Master–Monitor to submit any such issue to the Court for resolution." Mem. in Support of Mot. for Protective Order at 21. Defendants also allege that "[n]ot only does [the Monitor] seek to deprive the Interior Defendants of having substantive disputes that arise during depositions decided by the Court after a fair hearing, he intends to punish counsel for the Interior Defendants for even taking a position that differs with his own." Id. at 22.

The Court must determine whether the proposal of the Monitor exceeds the authority vested in him by his order of appointment. The Monitor issued his proposal in a letter dated January 2, 2003:

[I]n future depositions, should counsel refuse to abide by my direction on discovery disputes that are unquestionably within my

---

**6.** In the portion of defendants' motion accusing the Monitor of having become a "de facto litigant," defendants also claim that

> [t]he Special Master–Monitor has now gone even further and embarked upon an investigation of the Government's regulations and policies concerning the provision of private legal representation at Federal expense as they have been applied to Mr. Slonaker. In so doing, he has broadened the reach of his discovery demands to now include a Deputy Assistant Attorney General who oversees a Government office with no responsibility for this litigation. Under even the most liberal reading of the Order appointing him, such matters are well outside the scope of his authority.

Mem. in Support of Mot. for Protective Order at 15. Though defendants falsely claim that the Monitor has made "discovery demands" on a deputy assistant attorney general, the letters appended by defendants to their motion tell a different story. On January 2, 2003, the Monitor informed defense counsel of his concerns about defense counsel's statement to former Special Trustee Slonaker that "because it appears that your interests may not be entirely consistent with those of the United States, you may wish to obtain your own counsel" in conjunction with the instant case. Mot. for Protective Order, Ex. P, at 1–2. Defense counsel apparently forwarded the Monitor's letter to Deputy Assistant Attorney General Jeffrey S. Bucholtz, who responded to the Monitor's concerns in a letter dated January 10, 2003. Mot. for Protective Order, Ex. Q. Bucholtz closed his letter by asking the Monitor to "[p]lease contact [him] if you have any additional questions." Id. at 4. In a letter dated January 15, 2003, the Monitor responded, thanking Bucholtz for his letter and asking a series of followup questions. Mot. for Protective Order, Ex. R. The Monitor's letter did not characterize these questions as interrogatories put to Bucholtz, nor did the Monitor request that Bucholtz send any documents or other items to him.

The fact that defense counsel would misrepresent a legitimate inquiry by the Monitor, in response to an invitation for followup questions, as the issuance of "discovery demands" on a deputy assistant attorney general only confirms the Court's fear that the Justice Department attorneys in charge of the instant litigation have lost any sense of perspective about the manner in which this litigation should be conducted.

**7.** Apparently, were it up to defendants, the Special Master–Monitor would just be "special."

authority to resolve as granted to me by the Court in its September 17, 2002 Order, including but not limited to the regulation of deposition questioning, consideration will be given to terminating the deposition and filing a Report and Recommendation to the Court recommending an Order to Show Cause be issued requiring counsel to answer why his or her conduct should not be referred to the Disciplinary Panel of the U.S. District Court for the District of Columbia for review and appropriate action pursuant to Rule 8.4(d) of the District of Columbia Rules of Professional Conduct and why his or her conduct does not warrant personal monetary sanctions pursuant to Federal Rule of Civil Procedure 37(A)(4).

Mot. for Protective Order, Ex. T, at 3 (footnote omitted). The Monitor explained that he considered this rule to be necessary because in a recent deposition, defense counsel had "refused to permit the Acting Special Trustee to answer plaintiffs' counsel's questions even following my ruling on the appropriateness of the questions and direction that the witness answer them." *Id.* at 2.

The refusal of defense counsel to permit Acting Special Trustee Donna Erwin to answer questions as to whether her co-counsel had lied to the Court during a recent hearing resulted in the filing of a motion to compel this testimony. The Court subsequently determined that in response to the questions put forth by plaintiffs, defense counsel had repeatedly made frivolous assertions of attorney-client privilege. *See* Mem. and Order dated Feb. 7, 2003, at 27. Additionally, the Court found that during the Erwin deposition, defense counsel had repeatedly attempted to restrict the scope of plaintiffs' questioning by asserting, without any factual basis, that the Court had only permitted the deposition to proceed because of its purported assumption that plaintiffs' questions would be limited to inquiry into facts that go to the creation of plaintiffs' plans. *Id.*

Therefore, the proposal by the Monitor emerged as a response to what the Monitor perceived (and the Court has found) to be unscrupulous tactics on the part of defense counsel to obstruct a legitimate inquiry into whether her co-counsel had lied to the Court. Viewed in its proper context, the Monitor's proposal emerges as an admirable response to a situation that had arisen during a recent deposition, during which defense counsel had interfered with the Monitor's ability to carry out his duties as discovery master, as set forth in his order of appointment.

The Court must examine the language of that order to determine whether the Monitor's proposal would exceed the authority that the Court has vested in him. Under the terms of his appointment order, the Monitor was given the authority to "oversee the discovery process in this case and administer document production ... to ensure that discovery is conducted in the manner required by the Federal Rules of Civil Procedure and the orders of this Court." Order dated Sept. 17, 2002 at 4. The Monitor was also ordered to "file with the Court, with copies to defendants' and plaintiffs' counsel, his report and recommendation as to any discovery dispute that arises which cannot be resolved by the parties." *Id.* Additionally, the Court ordered the Monitor to "periodically file reports with the Court, with copies to defendants' and plaintiffs' counsel, that bring to the Court's attention all discovery disputes encountered in this case ... [and that] apprise the Court of the status of the Special Master–Monitor's report and recommendation as to all such disputes." *Id.* The Monitor was also given the authority "to regulate all proceedings in every hearing before the master-monitor and to do all acts and take all measures necessary or proper for the efficient performance of the master-monitor's duties, as set forth in this order" and "at any time, [to] call to the Court's attention any matter that bears on the compliance with any order of this Court or any applicable law." *Id.* at 3, 4.

■ The question raised by defendants' motion is best analyzed as a series of discrete issues. The first issue is whether the terms of the Monitor's appointment order permit him to regulate deposition questioning. The order provides the Monitor with the authority to "oversee the discovery process in this case ... to ensure that discovery is conducted in the manner required by the Federal Rules of Civil Procedure and the orders of

this Court" and "to regulate all proceedings in every hearing before the master-monitor and to do all acts and take all measures necessary or proper for the efficient performance of the master-monitor's duties." It would be difficult to conclude that the authority vested in the Monitor to "oversee the discovery process" and "regulate all proceedings in every hearing" before him does not include the power to regulate deposition questioning. The Court therefore finds that the Monitor possesses the authority to issue directions to the parties and their counsel in response to any objections asserted during the depositions at which he presides.

The second issue is the extent to which the Monitor's appointment order authorizes him to resolve any dispute about the directions he issues to the parties and their counsel in response to questions propounded during a deposition. On the one hand, the Monitor is authorized to "regulate all proceedings in every hearing before the master-monitor and to do all acts and take all measures necessary or proper for the efficient performance of the master-monitor's duties." On the other hand, the Monitor has been ordered to "file with the Court, with copies to defendants' and plaintiffs' counsel, his report and recommendation as to any discovery dispute that arises which cannot be resolved by the parties." In a report and recommendation issued on November 15, 2002, the Monitor acknowledged that the appointment order "does not provide or does not detail what would be considered a discovery dispute and what would not." Report and Recommendation of the Special Master–Monitor on the Extent of the Authority of the Special Master–Monitor to Regulate All Phase 1.5 Trial Discovery Proceedings and the Need for Clarification of the September 17, 2002 Order Appointing the Special Master–Monitor ("November 15 Report") at 10. The Monitor requested that the Court issue a supplemental order clarifying the above-mentioned language in his appointment order. *Id.* at 11–12. However, such an order might be construed as a modification of the appointment order, from which the Court will refrain while the Monitor's appointment order is on appeal to the D.C. Circuit.

However, the Court has reason to believe that its decision to refrain from ruling on the extent of the Monitor's authority to resolve discovery disputes will not prove fatal to the discovery process in this litigation. As defendants themselves concede,

> not all discovery disputes actually necessitate immediate rulings and in some instances do not require resolution at all. Objections that are initially (and often reflexively) asserted are usually not pursued at all or are mooted by subsequent events. For example, the mere occurrence of an "objection" during a deposition or in responding to a document request, does not, in the first instances, require intervention by the Special Master–Monitor. The ordinary practice in depositions where a special master is not used is to proceed with the examination with the objection noted and deferring the "dispute" for later reflection. The party making the objection or seeking discovery may or may not find it necessary to pursue the objection.

Interior Defs.' Resp. and Objections to November 15 Report at 11. The Court agrees that the ordinary practice during depositions in the instant case when an objection is raised should be to proceed with the examination with the objection noted by the Monitor unless, pursuant to Rule 30(d)(1), counsel properly instructs the deponent not to answer "when necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion under Rule 30(d)(4)." [8] Of course, as recently demonstrated, the Court will consider the possibili-

---

8. Rule 30(d)(4) states, in relevant part, that

[a]t any time during a deposition, on motion of a party or of the deponent and upon a showing that the examination is being conducted in bad faith or in such manner as unreasonably to annoy, embarrass, or oppress the deponent or party, the court in which the action is pending or the court in the district where the deposition is being taken may order the officer con-

ducting the examination to cease forthwith from taking the deposition, or may limit the scope and manner of the taking of the deposition as provided in Rule 26(c) . . . Upon demand of the objecting party or deponent, the taking of the deposition must be suspended for the time necessary to make a motion for an order.

ty of imposing sanctions in response to an improper instruction by counsel directing a deponent not to answer a question.

■ The third issue is whether the terms of the Monitor's appointment order permits him to terminate a deposition over which he is presiding. It would seem obvious that the power vested in the Monitor to "oversee the discovery process in this case ... to ensure that discovery is conducted in the manner required by the Federal Rules of Civil Procedure and the orders of this Court" and "to regulate all proceedings in every hearing before the master-monitor and to do all acts and take all measures necessary or proper for the efficient performance of the master-monitor's duties" necessarily entails the power to determine when a deposition should be terminated. After all, if under Rule 30(d)(4), parties and deponents are afforded the authority to suspend depositions in order to move for an order to terminate the deposition upon a showing that an examination is being conducted in bad faith or to annoy, embarrass, or oppress the deponent or party in an unreasonable manner, it would seem unremarkable to bestow a similar authority upon the special master overseeing the deposition. The Court therefore finds that the Monitor possesses the authority to determine when a deposition over which he is presiding should be terminated.

■ The final issue is whether the terms of the Monitor's appointment order permits him to file a report and recommendation with the Court recommending that an order to show cause be issued requiring counsel to answer why his or her conduct should not be referred to the Disciplinary Panel or why his or her conduct does not warrant sanctions under Rule 37. Given the authority of the Monitor "at any time, [to] call to the Court's attention any matter that bears on the compliance with any order of this Court or any applicable law," the Court concludes that it is manifestly within the scope of the Monitor's powers to recommend to the Court that a show cause order be issued,. if the Monitor

has reason to believe that counsel has violated any law, including the Federal Rules of Civil Procedure and the District of Columbia Rules of Professional Conduct.[9] Taking into account the recent conduct of defense counsel, the Court considers the authority of the Monitor to file such a report and recommendation to constitute a necessary corrective to any unethical or obstructive behavior engaged in by counsel during discovery proceedings.

In sum, the Court finds that each of the individual provisions of the Monitor's proposal, with the exception of resolving disputes concerning directions issued to counsel in response to questions propounded during a deposition, are permissible under the authority vested in the Monitor pursuant to his appointment order. Accordingly, during all future depositions, the Monitor may issue directions to the parties and their counsel in response to any objections asserted during depositions at which he presides. The ordinary practice should be for the examiner to continue with his or her examination, and for the Monitor to note the objection. However, if counsel instructs the deponent not to answer, and explains that the instruction is necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion under Rule 30(d)(4), the examiner should proceed to the next question unless counsel decides to permit the witness to answer the previous question. Additionally, during the course of any deposition, if the Monitor believes that counsel for either party or the deponent is engaging in conduct that seriously interferes with the proper administration of the deposition—i.e., akin to the conduct of defense counsel during the December 20, 2002 deposition of Donna Erwin—the Monitor should remind the offending person or persons that the Monitor may, in his discretion, terminate the deposition. If the offending person or persons does not cease from the offending behavior, the Monitor may, in his discretion, terminate the de-

---

9. In this context, it is worth calling attention to Rule 30(d)(3) of the Federal Rules of Civil Procedure, providing that "[i]f the court finds that any impediment, delay, or other conduct has frustrated the fair examination of the deponent, it may impose upon the persons responsible an appropriate sanction, including the reasonable costs and attorney's fees incurred by any parties as a result thereof."

position and/or file a report with the Court concerning the offending behavior in question. Such a report may, inter alia, include a recommendation that the Court issue an order to show cause requiring the offending person or persons to explain why his or her conduct should not be referred to the Disciplinary Panel for review and appropriate action, or why his or her conduct does not warrant sanctions pursuant to Rules 30(d)(3) or 37(a)(4)(A) of the Federal Rules of Civil Procedure.

The Court also finds no reason why any portion of defendants' motion for a protective order should be granted. Accordingly, the Court will deny defendants' motion in full.

B. Sanctions Under Rule 26(c)

█ In their opposition brief, plaintiffs request that the Court award sanctions under Rule 26(c) of the Federal Rules of Civil Procedure against defendants if the Court denies defendants' motion. Pls.' Opp. Br. at 15–16. Rule 26(c), which governs protective orders, provides in relevant part that "[i]f the motion for a protective order is denied in whole or in part, the court may, on such terms and conditions as are just, order that any party or other person provide or permit discovery. The provisions of Rule 37(a)(4) apply to the award of expenses incurred in relation to the motion." Rule 37(a)(4), in turn, provides in relevant part that

[i]f the motion is denied, the court ... shall, after affording an opportunity to be heard, require the moving party or the attorney filing the motion or both of them to pay to the party or deponent who opposed the motion the reasonable expenses incurred in opposing the motion, including attorney's fees, unless the court finds that the making of the motion was substantially justified or that other circumstances make an award of expenses unjust.

This Court has recently observed, regarding Rule 37(a)(4), that

"[t]he Supreme Court has stated that a party meets the 'substantially unjustified' standard when there is a 'genuine dispute' or if 'reasonable people could differ' as to the appropriateness of the motion." *Alexander v. FBI*, 186 F.R.D. [144] at 147

[(D.D.C.1999)] (quoting *Pierce v. Underwood*, 487 U.S. 552, 565[, 108 S.Ct. 2541, 101 L.Ed.2d 490] (1988)); *see also* 8A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2288 (2d ed. 1994) ("Making a motion, or opposing a motion, is 'substantially justified' if the motion raised an issue about which reasonable people could genuinely differ on whether a party was bound to comply with a discovery rule."). "[A] party's position is not substantially justified if there is no legal support for it, if the party concedes the validity of his opponent's position after causing everyone time and money, or, worse, defies an unequivocally clear obligation." *Boca Investerings P'ship v. United States*, 1998 WL 647214 at *2 (D.D.C.1998), *rev'd on other grounds*, [314 F.3d 625,] 2003 WL 69563 (D.C.Cir. 2003). There is no requirement that the court find that counsel acted in bad faith. *Alexander v. Interim Legal Servs., Inc.*, 1997 WL 732432 (D.D.C.1997) (citing *Devaney v. Continental Ins. Co.*, 989 F.2d 1154, 1162 (11th Cir.1993)).

Mem. and Order dated Feb. 5, 2003 at 22. Therefore, the task for the Court is to determine whether reasonable people could genuinely differ as to the appropriateness of defendants' motion for a protective order.

Defendants have failed to cite any case in which a party sought a protective order against a court-appointed special master. Nor has the Court been able to locate any case, statute, or secondary authority that even hint at any circumstances under which the filing of a motion for a protective order against a special master would be appropriate. It would certainly seem improper to issue such an order, given that the duties assigned to special masters may sometimes include the authority to rule on the parties' motions for protective orders, and even to issue such orders. *See, e.g., Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1293 (8th Cir.1997) (referencing motion for protective order that had been denied by the special master); *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1409 (9th Cir.1990) (same); *In re "Agent Orange" Product Liab. Litig.*, 94 F.R.D. 173, 174 (E.D.N.Y.1982) (appointing special master with the authority to "[r]ule

on all applications for any protective orders in this litigation and, in appropriate circumstances, grant requests for modification of, or exceptions to, such protective orders"); *In re "Agent Orange" Product Liab. Litig.*, 96 F.R.D. 582 (E.D.N.Y.1983) (approving protective order issued by special master precluding dissemination to the media of certain documents produced during discovery). In fact, the notion that a court would issue a protective order against a judicial official is so bizarre that the sole conclusion for a reasonable person to reach is that a demand for the issuance of such an order is patently frivolous. The Court therefore finds that reasonable people could not genuinely differ as to the appropriateness of defendants' motion.

Before imposing sanctions, however, the Court must also determine whether other circumstances would render an award of sanctions against defendants unjust. In making this determination, it will be useful to examine the circumstances that led up to the filing of defendants' motion. The correspondence between the Monitor and defense counsel demonstrates that in response to the Monitor's repeated requests for documents to assist him in his monitoring duties, defense counsel repeatedly stonewalled in response to the Monitor's requests and challenged the Monitor's legitimate authority, prior to filing the motion for a protective order. Additionally, during the course of a deposition ordered by this Court, defense counsel repeatedly made baseless assertions of attorney-client privilege, ignoring the finding of the Special Master–Monitor that plaintiffs' questions were appropriate, in an attempt to obstruct plaintiffs' legitimate inquiry into whether her co-counsel had lied to the Court during a recent hearing. It was this unethical conduct that led the Monitor to propose the rule that defendants have challenged in the motion presently before the Court. In short, the filing of defendants' motion represents the culmination of a series of displays of obstinacy, recalcitrance, and unprincipled behavior on the part of defense counsel.

The Court fails to discern any circumstances in relation to the present matter that would make an award of sanctions against defendants and their counsel unjust. In fact, the Court concludes that it would be unjust *not* to sanction defendants and their counsel for wasting plaintiffs' time and resources by requiring them to respond to a completely frivolous motion. Accordingly, the Court will order sanctions to be imposed. As in its February 5 opinion, the Court will not prevent the United States from reimbursing defense counsel, if it elects to do so.

### III. CONCLUSION

As a direct result of defendants' filing of a frivolous motion, the Court and plaintiffs were unnecessarily required to expend time and effort. Defense counsel also wasted the Monitor's time by refusing to respond to his document requests, and refusing to abide by a reasonable rule promulgated by him in response to counsel's obstructionist behavior. Another district court, faced with similarly unprincipled conduct by an attorney for the government, imposed sanctions against her, explaining that

> [i]f the defendants' ability to defend themselves fully can be compromised by government misconduct without an appropriate remedy, then the integrity of the judicial process is damaged. The government, acting through one of its representatives, cannot place the defendants at a disadvantage, argue against dismissal, and walk away from the situation immune from accountability.

*United States v. Horn*, 811 F.Supp. 739, 754 (D.N.H.1992), *rev'd in part*, 29 F.3d 754 (1st Cir.1994). This Court fully agrees with the district court's conclusion. Accordingly, it is hereby

ORDERED that defendants' motion for a protective order as to discovery by the Special Master–Monitor and as to the rule announced by the Special Master–Monitor concerning deposition questioning [1747–1] be, and hereby is, DENIED. It is further

ORDERED that, pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, defendants and their counsel, Sandra P. Spooner, Assistant Attorney General Robert D. McCallum, Deputy Assistant Attorney General Stuart E. Schiffer, and Justice Depart-

ment attorneys J. Christopher Kohn and John T. Stemplewicz shall pay to plaintiffs all reasonable expenses, including attorneys' fees, that plaintiffs incurred in opposing defendants' motion for a protective order. It is further

ORDERED that within thirty (30) days of the date of this opinion, plaintiffs shall submit to the Court an appropriate filing detailing the amount of reasonable expenses and attorneys' fees incurred in opposing defendants' motion for a protective order. Any response to this filing shall be submitted to the Court within thirty (30) days thereafter. It is further

ORDERED that defendants' motion for leave to supplement their motion [1779–1] be, and hereby is, DENIED as moot.

SO ORDERED.